IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


VAUGHN L. FLOURNOY,          )
                           )
               Plaintiff,   )    **CIVIL ACTION**
                           )
v.                         )    No.  07-3108-MLB
                           )
DAVID R. MCKUNE, et al.,    )
                           )
               Defendant.   )


**MEMORANDUM AND ORDER**

## I.  INTRODUCTION

This case comes before the court on petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.)  The matter has been fully briefed and is ripe for decision.  (Docs. 5, 8.)  The application is DENIED for reasons set forth herein.

Petitioner was convicted of first-degree premeditated murder and battery following a jury trial in state court and sentenced to life in prison.  In a federal habeas proceeding, the state court's factual findings are presumed correct and petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Petitioner does not challenge the state court's findings.  Accordingly, the court incorporates the Kansas Supreme Court's version of the facts:

> On the morning of November 26, 1997, Flournoy walked into the Kansas City, Kansas, Police Department and turned himself in for killing his grandmother Lillian Thomas. Detective Clyde Blood took Flournoy's statement. Blood said Flournoy was "nervous, obviously, but cooperative the whole time." Flournoy could not remember everything that happened, saying, "[M]y wife had told me the other night I snapped, I killed my grandmother.... I told them I just wanted to know if it was true. If it's true I'm here. If

it's not, I'm sorry for wasting your time." Lab tests
showed that Flournoy's blood contained Benzoylecgonine,
which is metabolized cocaine, and caffeine. Forensic
pathologist Dr. Eric Mitchell testified that Thomas
suffered two gunshot wounds in the hairline of her scalp,
one in her right front chest, one in her left front chest,
and one on her right arm forearm. Dr. Mitchell said the
shooter was 2 or 3 feet away from Thomas when the shots
were fired. All of the shots except the wound to the arm
could have been fatal, and all shots most likely took place
in less than 1 minute.

During Flournoy's interview, the police asked him why
he hurt Thomas. He said, "She was going off on my wife
[girlfriend Cheryl Key] and then I know nothing else." He
said that he and Key were upstairs talking. He was feeling
"unstable," and they were discussing his feelings. Flournoy
said Thomas called them downstairs and "started yelling how
stupid and ignorant" Flournoy and Key were. The next thing
he remembered was slamming into a dumpster in Thomas' car.

Flournoy said he used Thomas' .38 mm revolver, but he
did not remember how he got the gun. He could not remember
how many times he shot Thomas, how far he was from her when
he shot her, what part of her body he fired at, or what he
had done with the gun. The gun was not found. Flournoy
testified at trial.

### Flournoy's Trial Testimony

Flournoy explained that after age 12, he had lived
with his grandparents for most of his life. He moved out of
his mother's house because her boyfriends beat and molested
his sister. He joined the U.S. Navy after high school
graduation and served 3 years, eventually returning to live
with his grandparents. He had migraines and blackouts in
the past. His first wife and Key had both told him about
blackouts he had suffered. He was told that he had punched
a hole in the wall of his house, and once he attacked Key's
brother who had threatened him. The blackouts were brought
on by "stress" and "arguments." He tried to commit suicide
twice in 1996.

Around May 1996, Flournoy worked 12 hour shifts at a
casino and was stressed out. He "felt like [he] was losing
control." His mother took him to the Kansas University
Medical Center, where he stayed for 12 hours. He kept a
diary in which he wrote: "The same ole story of family
freaking out on each other and me coming home in time to
get cussed out and put out. This time the rage took over
and I decided to get help or kill her [Thomas]." After
leaving the medical center, he went to the City Union
Mission for the Christian Life Program, where he met Key,

who worked there as a cook. Flournoy apparently told Thomas that he would get counseling.

Regarding the day of the attacks, Flournoy testified that he remembered walking with Key and then the next thing he knew, he was getting up off the ground, and Key was telling him that he had attacked Thomas. He testified that Thomas yelled at him and told him that one day someone was going to blow his brains out, and she "started going off on Cheryl again." Flournoy went into the kitchen. He testified that this was the last thing he remembered. Later, he walked with Key from a hotel to a bus stop and then bought beer and cocaine. Then next morning, he went to the police station.

## Key's Testimony

Key testified at the preliminary hearing. After the district court found her unavailable at trial, her preliminary hearing testimony was read into evidence. She had known Flournoy for 2 years and was his girlfriend. On the weekend of November 22, 1997, she stayed with Flournoy at Thomas' house. On Monday, November 24, she and Flournoy went to the public library, where he looked for a book on "demonology." Flournoy told Key that his mother introduced him to demonology when he was 9 years old and that he practiced it on his own for 9 years. They returned to Thomas' house, watched television, shared a beer, and played cards.

Later that day, Flournoy and Key went shopping. While they were walking, Flournoy suddenly grabbed Key, lifted her off the ground, threw her down, and punched her all over, leaving both eyes black. After he stopped, the police arrived. Key did not press charges. Key and Flournoy returned to the house.

After the incident, Key said that Thomas told her that she (Key) did not deserve "to be hit" and "was better than that." Then Flournoy joined them, and the three talked for awhile. After Key went upstairs, she overheard Flournoy ask Thomas about "Sister Rickie." She heard Thomas say that she did not know what he was talking about and to "get out of my face with that mess." Key thought Sister Rickie was a pastor at a church, but she did not know which one.

As Flournoy came upstairs, he told Key, "She [Thomas] tells me f_____ my mother and then she tells me love my mother." Then, he dropped down on his knees in front of Key and grabbed her shirt, saying "[P]lease tell me about your God, please tell me about your God." Key said she pointed to a Bible and said, "Read your Bible." He then lit a cigar and sat cross-legged on the floor. Thomas started calling

him, but he did not move. She asked him if he heard Thomas, and he said, "Yes," but he did not move. He just stared straight ahead. When asked by defense counsel if Flournoy appeared to be in a trance, Key said, "Yes."

Key went back downstairs to talk to Thomas. Thomas eventually hollered for Flournoy again. He came downstairs, and Thomas "started fussing at him" and asked why he and Key were fighting. Flournoy asked her what she was talking about. A few minutes later, he called out to Key in a "tone of voice ... so different." Key saw Flournoy standing by the kitchen sink with a knife in his hand. In a loud voice, Key told Flournoy to put down the knife.

Key sat in the living room in a chair next to Thomas, and Flournoy sat at the kitchen table. After a while, Thomas "started hollering at [Flournoy] again" for about 45 minutes to an hour. Thomas said Flournoy needed to get his life together and that he could not be a good husband for Key. Key said that Flournoy came into the living room with a gun in his right hand, with his arm at his side. She jumped up, stood in front of him, and said, "Don't do that, put that up." Flournoy did not say anything.

He raised the gun over Key's shoulder and pulled the trigger. After the first shot, Key told him to stop and ran into the kitchen. Flournoy said, "I have to put her out of her misery." Key heard two or three shots. Then, Flournoy played with Thomas' hair and "talked to her like she was still there." He told Key to go upstairs and get her purse and jacket. He showed her a small knife and said, "I'm going to take this with me, and ... when the police catch me I'm going to shoot myself and I want to be buried with my knife."

Flournoy went through Thomas' bedrooms and threw things around for the next 30 minutes. He took a drawer of pennies, a file box, and a jewelry box. He told Key to give the file box to a specific attorney, but Key could not remember the attorney's name. They left the house and walked to the car. Flournoy said, "Oh, I lost mamma's [Thomas] keys.... Mamma is going to be pissed I lost her keys and I can't find them." He broke one car window with a hand weight, but then he realized he had the keys. They drove around the block and returned to the house. They stayed a few minutes and then drove around Kansas and Missouri for 5 or 6 hours. Flournoy stopped at a gas station, 2 or 3 banks, and a friend's house in an attempt to exchange the pennies for paper currency.

Flournoy did not start talking to Key until several hours into their drive. She asked him if he remembered what he did and told him that he needed to turn himself in. She

-4-

> said Flournoy looked "kind of puzzled" and said he did not remember.
>
> When Key told Flournoy what had happened, he said he would turn himself in, but first he wanted to watch the news to see what was going on. They checked into a hotel, and then Key went home on a bus. Flournoy said he would let her leave because she had kids that needed her.

State v. Flournoy, 272 Kan. 784, 786-790, 36 P.3d 273, 277-79 (2001)(Flournoy I).

The Kansas Supreme Court affirmed petitioner's conviction on direct appeal. However, the court found that there was insufficient evidence to support an aggravating sentencing factor and remanded the case for reweighing of the remaining single aggravating factor against the single mitigating factor. On remand, the district court found that the remaining aggravating factor was not outweighed by the mitigating factor and sentenced petitioner to life imprisonment with no possibility of parole for 40 years ("Hard 40"). Thereafter, petitioner appealed, asserting that the court failed to consider all mitigating factors and that the Hard 40 sentencing scheme was unconstitutional. This time, the Kansas Supreme Court affirmed petitioner's sentence. State v. Flournoy, 80 P.3d 71, 2003 WL 22938959 (Kan. Dec. 12, 2003)(Flournoy II). Petitioner then sought post-conviction relief under K.S.A. 60-1507. The state district court denied relief, the Kansas Court of Appeals affirmed, and the state supreme court denied review. State v. Flournoy, 144 P.3d 81 (No. 95, 426)(Kan. Ct. App. Oct. 20, 2006)(Flournoy III). Petitioner was represented by counsel throughout his state proceedings.

## II.  ANALYSIS

This court's ability to consider collateral attacks on state

criminal proceedings is circumscribed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the highly deferential standard set forth in AEDPA, if petitioner's claim has been decided on the merits in a state court, a federal habeas court may only grant relief under two circumstances: 1) if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or 2) if the state court decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2).

> A state court decision is "contrary to" Supreme Court precedent in two circumstances: (1) when "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases"; or (2) when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from" that reached by the Court. Williams v. Taylor, 529 U.S. 362, 406, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state court decision constitutes an "unreasonable application" of Supreme Court precedent if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. 1495. Thus, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411, 120 S. Ct. 1495; see also Thomas v. Gibson, 218 F.3d 1213, 1219-20 (10th Cir. 2000) (discussing Williams).
> Finally, a state prisoner seeking habeas relief based on alleged erroneous factual

> determinations must overcome by clear and convincing evidence the presumption of correctness afforded state court factual findings. <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Smith v. Mullin</u>, 379 F.3d 919, 924-25 (10th Cir. 2004).

<u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1186 (10th Cir. 2006). An inherent limitation to review under § 2254 is that a habeas court will only consider alleged violations of <u>federal</u> law. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80 (1991). Moreover, the court will not normally consider federal questions unless they have first been presented to the state courts. <u>Picard v. Connor</u>, 404 U.S. 270, 277-78, 92 S. Ct. 509, 513 (1971); <u>but see</u> 28 U.S.C. § 2254(b)(2) (permitting <u>denial</u> on the merits, despite failure to exhaust state remedies).

On direct appeal of his conviction and sentence, petitioner alleged eight errors: 1) prosecutorial misconduct in closing statement; 2) insufficient evidence to support the aggravating factors in imposing a Hard 40 sentence; 3) Kansas' Hard 40 scheme violates the Sixth and Fourteenth Amendments; 4) admitting Cheryl Key's preliminary hearing transcript; 5) allowing Vivian Shannon to testify about a diary entry; 6) allowing testimony of Mr. Huerter of Larned Hospital; 7) allowing inadmissible character evidence; and 8) failing to instruct on petitioner's theory of defense. Br. of Appellant in <u>Flourny I</u>.

After the district court's resentencing, petitioner appealed the sentence and alleged two errors: 1) failure to find that petitioner's cooperation with police was a mitigating factor; and 2) Kansas' Hard 40 scheme violates the Sixth and Fourteenth Amendments. Br. of Appellant in <u>Flourny II</u>. On state collateral appeal, petitioner

alleged ineffective assistance of counsel for failing to present a mental defect defense, failure to deliver petitioner's Navy medical records to the Larned staff and failure to establish that petitioner's mitigating circumstances outweighed the aggravating circumstances. Br. of Appellant in <u>Flourny III</u>.

Petitioner's application in this court for federal habeas relief states eight grounds for relief. (Doc. 1). Petitioner has essentially raised all issues that were present in all three appeals in state court, with the exception of his argument that the Kansas' Hard 40 scheme is unconstitutional. The court will address each issue in turn.

### A.    Prosecutorial Misconduct

Petitioner asserts that his trial was tainted by prosecutorial misconduct. During closing argument, the prosecutor made several remarks that petitioner asserts deprived him of his right to a fair trial. (Br. of Pet'r in <u>Flournoy I</u> at 17.) Defense counsel did not object during the prosecutor's closing argument. On review, the Kansas Supreme Court found that the comments did not violate his right to a fair trial. "Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Miller v. Mullin</u>, 354 F.3d 1288, 1293 (10th Cir. 2004)(quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). "Counsel's failure to object to . . . the comments, while not dispositive, is relevant to a fundamental fairness assessment." <u>Walker v. Gibson</u>, 228 F.3d 1217, 1241 (10th Cir. 2000). In considering a claim of prosecutorial misconduct, the

court considers "the totality of the circumstances, evaluating the prosecutor's conduct in the context of the whole trial." <u>Cummings v. Evans</u>, 161 F.3d 610, 618 (10th Cir. 1998)(quotation omitted). Reviewing the strength of all the evidence, the question becomes whether the prosecutor's comments "plausibly could have tipped the scales in favor of the prosecution." <u>Id.</u> (quotation omitted).

Petitioner first claims that the prosecutor's statement that Thomas "let it go" but petitioner would not "let it go" was contrary to the evidence.  Petitioner asserts that the evidence established that at the time petitioner retrieved the gun Thomas was still yelling at petitioner.  (Doc. 1 at 6b)(R. Vol. III. at 43).  However, Detective Smith, who interviewed Cheryl Key, testified that Key stated Thomas was sitting in her chair eating ice cream immediately before petitioner entered the room with the gun.  (R. Vol. XI at 346). Moreover, Key's preliminary hearing testimony stated that Thomas was awake prior to the shooting because she had just "got through talking to her" before petitioner entered the room with the gun.  (R. Vol. III. at 47).  The prosecutor's comments were consistent with that testimony.

Next, petitioner asserts that the prosecutor erred by stating the following:

> [Petitioner] went to the kitchen and he grabbed a butcher knife, and at that point he intended to do harm to his grandmother. But for the action of Cheryl Key, when she saw him, that alarmed her, she knew he wasn't just in there fixing something for dinner. They already had dinner. And his actions upset her so much that she got out of her chair and went in to talk to him out in the kitchen and calmed him down; and it wasn't Vaughn that put the knife back, it was Cheryl who put it back after a few minutes.

(R. Vol. XIV at 756).

-9-

Petitioner asserts that the evidence established that petitioner put the knife away.  The State conceded that the prosecutor misstated the evidence during closing.  The Kansas Supreme Court determined that "the error about who put the knife away, had little, if any, likelihood of changing the result of the trial." Flournoy I, 272 Kan. at 796.  The court agrees.  While the prosecutor made an incorrect statement, it cannot satisfy the high hurdle of prejudice set forth in Donnelly.

Petitioner then asserts that the prosecutor's remarks about the victim's thoughts prior to her death and the statement that petitioner held her at gunpoint were improper.

> We know that she was sitting there watching television so she had to see him. Imagine what's going through her mind as she sees her own grandson, the one she has believed in for so many years stand there with a loaded gun, her own gun, looking at her with it. We know that he must have killed her immediately or held her at gunpoint and threatened her not to move, because she's still sitting in the same chair as she was in as she sat there and watched television. Maybe she didn't have time to get up and run away or maybe just horror that is going through her mind, maybe the shock of it all paralyzed-all the fear paralyzed her. Did she plead with him, did she beg him not to do this? I guess only Vaughn would know that.

(R. Vol. XIV at 759).

The Kansas Supreme Court determined that the comments about the victim's thoughts were improper but harmless given the overwhelming evidence of guilt.  The court "does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision." Walker, 228 F.3d at 1243.  However, if the "nature of the crime itself produced sympathy before the prosecutor made any comments," the remarks would not be sufficient to render the trial fundamentally unfair.  Id.  In Walker, the prosecutor suggested that one of the

-10-

victims was cold in his grave and that the defendant would take the other victim's words with defendant to his grave.  The Tenth Circuit determined that the nature of the crime would produce sympathy from the jury and therefore, the prosecutor's comments did not render the trial fundamentally unfair.  In this case, the court finds that the nature of this crime would produce sympathy from the jury.  The victim was the petitioner's grandmother and was killed while she was sitting in her pajamas watching television.  Considering the totality of the circumstances, the court finds that the prosecutor's comments about the victim's thoughts prior to her death did not result in a denial of his due process rights.

In reviewing the prosecutor's statement that the victim was either killed immediately or told not to move, the Kansas Supreme Court determined that the prosecutor was attempting to focus on the fact that the victim died while sitting in her chair.  The Kansas Supreme Court found no error in this statement. Key testified that petitioner walked into the room with the gun, Key jumped in front of petitioner and petitioner lifted the gun over her shoulder and shot Thomas.  The entire time Thomas remained seated in her chair.  It seems apparent that the prosecutor was concentrating on the fact that Thomas did not attempt to move when petitioner approached with the gun.  After reviewing the record, the only statement not entirely supported by evidence is the prosecutor's comment that petitioner may have told Thomas not to move.  The court finds, however, that the statement did not infect the trial with unfairness as to make the resulting conviction a denial of due process.

Petitioner next alleges that the following comments were made to

-11-

inflame the jury and are not supported by the evidence:

> [Thomas] raises her arm in probably self-defense, the gun being aimed at her, but her arm was no shield with that .38 Special. It went right through her arm.

> * * *

> Vaughn is not a stupid person. Vaughn is a manipulator. Vaughn knows ... how to say the right thing to manipulate the facts to benefit himself. He's a control freak, and he hates to be told what to do.

> * * *

> Vaughn wasn't crazy when this happened. There are some people out there in this society who kill and he is one of those people. He did not have a mental defect. He has no mental disease. He's been evaluated, he's been trying to push this theory for a ... long time. He actually has been evaluated twice at Larned, so he couldn't support his theory. He doesn't have anything medically or psychologically wrong with him that would cause him not to remember what he did or not be able to form an intent to kill. He has nothing wrong with him physically, psychologically, medically that would prevent him from forming premeditation to kill someone. There are no problems that would cause him to have blackouts or this so-called problem he has, he absolutely has no history of it even when he was in the military or otherwise. The only blackout he has ever had was from drinking too much. ... Why did he turn himself in? Well, maybe the guilt over it or maybe he thought he could get off on a lesser offense, maybe he thought you would all ... believe the story, the diminished mental capacity.

> * * *

> Now, this is a man that has been avoiding consequences all of his life for his actions. Blaming other people why he is the way he is. It's time now that this one final act of killing his grandmother he doesn't get away with. You all can find him accountable for his actions, he's not going to get away with his actions this time. You all must convict him of first degree premeditated murder.

(R. Vol. XIV at 760, 763-67).

The State asserted that these comments were supported by the evidence and the Kansas Supreme Court agreed. Flournoy I, 272 Kan. 798-99. After reviewing the record, the court agrees. The

-12-

prosecutor's comments were based on reasonable inferences from the evidence.

Finally, petitioner asserts that the prosecutor erred by calling him a liar.

> All that we know is that [petitioner's family] are adamant that he killed Lillian Thomas. To support this, his own family feels that way. What does that say? And you know families are not perfect and this family is not perfect just like yours and mine. We're not perfect, but if you listen to the evidence that was submitted in this case, most of the problems in this case come from this man Vaughn Flournoy, is the reason that this family discussed most of their problems. And he says everybody else is lying, sister lying, his mother is lying, his aunt is lying. The records from the Mission -- City Union Mission they're lying. The doctors from Larned. they're all lying. I think it's time we put an end to all the lies. It's not lies of his family, it's the lies of one man, that Vaughn Flournoy made.

(R. Vol. XIV at 782). The Kansas Supreme Court found that the prosecutor's remark was "improper" but would not have changed the outcome of the case. Flournoy I, 272 Kan. at 799.

While labeling a defendant as a "liar" may be improper in certain situations, "it is permissible for the prosecution to comment on the veracity of a defendant's story." Bland v. Sirmons, 459 F.3d 999, 1025 (10th Cir.  2006)(citing United States v. Hernandez-Muniz, 170 F.3d 1007, 1012 (10th Cir. 1999). Claims of prosecutorial misconduct where the prosecution referred to a defendant as a liar on account of inconsistencies between the defendant's testimony and other evidence in the case do not violate a defendant's due process rights. See id. In this case, petitioner testified that numerous witnesses were lying. It was therefore acceptable for the prosecutor to assert that defendant was the individual lying, not the witnesses who testified on behalf of the prosecution. The prosecutor's remark was nothing

-13-

more than fair commentary on the evidence and this court disagrees with the Kansas Supreme Court's view that the remark was "improper." But in the context of this proceeding, the state court's rulings were not an unreasonable application of <u>Donnelly</u>.

More importantly, even if all of the prosecutor's comments were improper, they were not so egregious as to constitute a miscarriage of justice. Petitioner's allegations of error, when viewed in light of the record, do not persuade the court that prosecutorial misconduct so tainted the proceedings as to deny due process. Even if there were a constitutional violation, the court must still review for harmlessness. <u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1190 (10th Cir. 2006). The evidence was not in dispute that petitioner committed the crime. Petitioner did not assert that he was actually innocent; rather he insisted that he blacked-out prior to the crime. Therefore, the only issue remaining for the jury was one of intent. Petitioner and Key were the only witnesses to support petitioner's alleged blackouts. Accordingly, the court cannot conclude that the Kansas Supreme Court erred in determining that the prosecutor's remarks were harmless and had little, if any, likelihood of changing the result at trial.

**B.   Cheryl Key's Testimony**

The court allowed the state to present Cheryl Key's preliminary hearing transcript to the jury after determining that she was unavailable to testify. Petitioner asserts that the admission of the testimony was error since the state failed to establish that it exercised due diligence in bringing Key to court. Petitioner does not dispute the findings of fact, but only whether those facts support the

-14-

conclusion that the state put forth a good-faith effort to produce Key.

"[I]n order to prove that prior testimony falls within the unavailability exception to the Confrontation Clause, the government must show it made a good-faith effort to obtain the witness's attendance at trial." <u>Cook v. McKune</u>, 323 F.3d 825, 832 (10th Cir. 2003)(citing <u>Ohio v. Roberts</u>, 448 U.S. 56, 74, 100 S. Ct. 2531, 65 L. Ed.2d 597 (1980)).

> <u>Ohio v. Roberts</u> identified the components of a defendant's confrontation right as the interests in cross-examining the witness, in requiring the witness to testify under oath, in allowing the factfinder to view the witness's demeanor, and in requiring the witness to face the defendant as he tells his story. If the state is allowed to prove its case using a transcript of prior testimony, rather than live testimony, the defendant certainly loses the chance to have the factfinder view the witness's demeanor, and he may also lose the chance to make the witness face him as the witness testifies. Despite the loss of these important aspects of confrontation, where the government is able to prove the unavailability of a witness, the Sixth Amendment includes a "rule of necessity" permitting use of prior testimony. But because there is a real cost to the defendant in foregoing true confrontation, the unavailability requirement must be more than a formality.

<u>Id.</u> (internal citations omitted).

The Kansas Supreme Court set forth the efforts put forward by the state in attempting to serve Key:

> During the trial, the prosecutor told the court that she had been unable to personally serve Key with a subpoena. The prosecutor moved the court for a finding of Key's unavailability in order to introduce the preliminary hearing transcript. The State presented testimony from two investigators from the district attorney's office. One testified that he first located Key in May 1998. He said the district attorney's office had trouble getting Key to appear at the preliminary hearing. At the time she lived in Kansas City, Missouri. Her family brought her in for the hearing. Because of the nature of this case, the investigator wrote down Key's date of birth, where she and

-15-

family members lived, her social security number, and her place of employment. According to the investigator, for out-of-state witnesses such as Key, the district attorney's office often "[goes] through the out-of-state witness act to secure a witness," which is what the State did here.

In June 1999, two investigators attempted to find Key for the trial. One discovered that Key had moved and left no forwarding address. Key's mother had died, so the investigator checked with other agencies to see where Key might have been living. He discovered places that Key had worked and got an address on Belfontaine in Missouri where she was receiving unemployment checks. He went to that address. Key was not there, but a woman told him she would be back later. He left a card and a message for Key to call him. He was told that Key did not have a phone number. The next day, he returned to the house, and he could hear people talking inside, but nobody would answer the door. He also went to the last known address of Key's mother, but the house had been condemned by the city.

The investigators prepared out-of-state motions. A second investigator testified that he tried to locate Key and serve her with a subpoena to testify at trial. He mailed subpoenas to three addresses, but two of the subpoenas were returned undeliverable. After out-of-state witness paperwork was filed, the chief investigator for the Jackson County, Missouri, District Attorney's office assisted in attempting to serve Key. A hearing was set in Jackson County, but investigators were unable to find her.

The second investigator went to Missouri to look for Key, going to four addresses. At the Belfontaine address he spoke to a young man who initially said Key did not live there, but then said that he knew her but did not know when she would be back. When the investigator returned to the house later that day, the front door was open, but when he started walking up the sidewalk, the front door slammed. He heard someone locking the door. He knocked, but nobody answered. The young man he had talked to earlier walked up to the front porch. He was "rude and guarded." The investigator left his card and a subpoena and asked the young man to give them to Key.

The investigator also learned that Key had been issued a new driver's license with the Belfontaine address on it. The investigator testified that the Missouri "SRS" gave him a phone number, which he called. He said the person who answered the phone was very "rude" and said they did not know Key and that she did not live there.

In addition, he also tried to track down Key's brother. During the investigation, he encountered someone

-16-

who knew her brother, and this person asked him about Flournoy. He also found Key's cousin, who said he would try to contact Key. Later, the cousin told the investigator that Key did not want to be involved and "[t]hat's why she is hiding." Right before trial, the investigator stopped by the Belfontaine house another time and left a note and a subpoena with a young woman.

The State then asked that Key be found unavailable. Defense counsel proffered that he received a phone message from Key on June 18, 1999. He had received a "family telephone number" from Flournoy, which defense counsel called. The lady who answered asked who was calling and then said that Key was not there. Counsel called again and left a message on an answering machine that had a greeting that said it was the "Key residence." When defense counsel did speak to Key on the phone, she told him that nobody had attempted to contact her and that she did not know anything about the trial. She also said she did not want to testify.

Flournoy I, 272 Kan. at 800-02.

The Kansas Supreme Court ultimately determined that the State used due diligence in attempting to find Key. Petitioner asserts that the since the State knew where Key was residing and did not produce her at trial, it failed to establish that it made a good-faith effort in finding Key. The court must determine whether the State's attempts to locate Key were reasonable. Cook, 323 F.3d at 835. An "evaluation of reasonableness or good-faith effort requires us to consider all the circumstances rather than to apply a per se rule." Id.

Four criteria have been established to evaluate whether the State's conduct was reasonable.

First, the more crucial the witness, the greater the effort required to secure his attendance. Second, the more serious the crime for which the defendant is being tried, the greater the effort the government should put forth to produce the witness at trial. Third, where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger. Fourth, a good measure of reasonableness is to require the State to make the same sort of effort to locate and secure the witness for trial that it would have made if

-17-

it did not have the prior testimony available.
Id. at 835-36.

In evaluating the criteria, it is obvious that Key was a crucial witness for the State. She was the only one, besides petitioner, who witnessed the shooting. Also, petitioner was on trial for a very serious crime, first-degree premeditated murder. However, petitioner has not shown any "special reason" that Key's testimony would favor the prosecution. She was petitioner's girlfriend. The State made many attempts to locate Key at the address in Missouri and through relatives. The State also sought assistance of the Jackson County, Missouri, investigators to find her and they could not locate Key. While she may have been living at the residence on Belfontaine, the attempts to contact her at the address were unsuccessful. Moreover, one of Key's relatives stated that she was "hiding" because she did not want to testify. While the prosecution may have made an additional attempt to find Key at the Belfontaine address if the preliminary transcript had not been available, the prosecution would have had no guarantee that Key would appear at trial if they had been able to subpoena her. Key did not want to testify at trial and had stated as much on at least two separate occasions.[1]

The district court determined that the State made a good faith effort to serve a subpoena on Key. The court stated that it did not believe the statute required the State to post someone at the

---

[1] Key testified at the preliminary hearing that she did not want to testify and told defense counsel immediately prior to the trial that she did not want to testify. In addition, her cousin informed the investigator that she was hiding because she did not want to be involved.

-18-

Belfontaine address twenty-four hours a day in order to serve the subpoena.   The Kansas Supreme Court upheld the district court's decision to admit Key's testimony from the preliminary hearing and the court agrees with that ruling.   The court finds that the State's efforts were reasonable based on the totality of the circumstances. C.f. id. at 839 (the state made no efforts to search for the witness); See Martinez v. Sullivan, 881 F.2d 921, 924-26 (10th Cir. 1989).   The State employed at least three investigators (in Kansas and Missouri) to find Key, contacted various relatives and SRS, and attempted to personally serve Key at the Belfontaine address on numerous occasions.

Petitioner's request for relief on this basis is denied.

**C.   Petitioner's Diary**

Petitioner asserts the trial court erred in admitting a statement contained in petitioner's diary.   The diary, written in petitioner's handwriting in May 1996, stated that petitioner felt like he was going to kill his grandmother.   "[S]tate court rulings on the admissibility of evidence may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." Walker v. Gibson, 228 F.3d 1217, 1239 (10th Cir. 2000)(quoting Duvall v. Reynolds, 139 F.3d 768, 787 (10th Cir. 1998).   Petitioner wholly fails to explain how the state court's evidentiary ruling resulted in a fundamentally unfair trial.   Viewed in light of the entire record, the court finds no fundamental unfairness which might warrant habeas corpus relief.   Even though that statement may have been prejudicial to petitioner, petitioner's mother had previously testified that in May 1996 petitioner called his mother and asked her to immediately pick him up

from his grandmother's home or he would kill his grandmother.[2]
Accordingly, the court fails to see how the admission of the diary
resulted in actual prejudice. <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619,
637, 113 S. Ct. 1710, 123 L. Ed.2d 353 (1993)(petitioner is "not
entitled to habeas relief based on trial error unless [he] can
establish that it resulted in 'actual prejudice.'")

Petitioner's request for relief on this basis is denied.

**D.   Dr. Huerter's Testimony**

Petitioner next claims that his Fifth Amendment rights were
violated when the trial court allowed the government to use his
involuntary statement, introduced during rebuttal through Dr. Huerter,
against him.   In considering this matter, the Kansas Supreme Court
noted that petitioner had failed to raise this issue in the trial
court.   <u>Flournoy I</u>, 272 Kan. at 804.   Although petitioner did not
raise the issue during trial, the court determined that the admission
of the evidence was not error because it was proper rebuttal testimony
and, in the alternative, petitioner was not prejudiced by the
testimony since it was cumulative of Dr. Fernando's testimony.[3]
Accordingly, despite the brevity with which the state court discussed
the matter, it is clear that it reached the merits of this claim, and
its decision is thus entitled to AEDPA deference.   <u>Paine v. Massie</u>,
339 F.3d 1194, 1198 (10th Cir. 2003).

Statements obtained in violation of a defendant's Fifth and Sixth

---

[2] Petitioner's counsel did not object to this testimony during
trial.

[3] The Kansas Supreme Court determined that petitioner had waived
any objection to Dr. Fernando's testimony.   <u>Flournoy I</u>, 272 Kan. at
806.

Amendment rights may be used against him for impeachment and in rebuttal. <u>Michigan v. Harvey</u>, 494 U.S. 344, 350-51, 110 S. Ct. 1176, 1180-81, 108 L. Ed. 2d 293 (1990). Moreover, not every statement taken after the Sixth Amendment's right to counsel attaches is unlawful; like the Fifth Amendment's right to counsel, this right can be waived. <u>Id.</u> at 352, 110 S. Ct. at 1181. However, for an incriminating statement to be admissible for any purpose, it must have been voluntary.[4] <u>Id.</u>

Although petitioner devotes several pages to this contention, he never cites the "statements" which supposedly were improperly admitted. The Kansas Supreme Court's opinion does not identify the "statements." Whatever the "statements" were, they allegedly were made by petitioner during two separate psychological evaluations requested by petitioner's counsel regarding petitioner's competency to stand trial and to determine whether petitioner suffered from a mental defect at the time of the crime. Dr. Huerter evaluated petitioner at Larned. Dr. Huerter concluded that petitioner had the ability to formulate intent and did not suffer from a mental defect. In response to petitioner's testimony that he suffered a "blackout" when he murdered his grandmother, Dr. Huerter was called in rebuttal and testified that petitioner did not suffer from a blackout at the time of the crime. Petitioner asserts that this testimony violated his Fifth Amendment rights because he was not given a <u>Miranda</u> warning prior to his evaluation.

Whatever petitioner's statements may have been, they were

_____

[4] Petitioner does not contend that the statements were coerced and involuntary.

properly admitted.  Harvey, 494 U.S. at 350-52, 110 S. Ct. 1176, 1180-81.

### E.  Character Evidence

In ground five, petitioner asserts that the trial court erred in allowing Drs. Huerter and Fernando testify.  Petitioner argues that their testimony was inadmissible under K.S.A. 60-447 as character evidence.  The Kansas Supreme Court first determined that there was no error since the evidence was not offered as evidence of petitioner's character traits and, alternatively, held that petitioner failed to make a proper objection during trial.

A claim is procedurally defaulted, and thus unreviewable by a federal habeas court, when the claim has been defaulted in state court on an independent and adequate state ground.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  "A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for the decision.  For the state ground to be adequate, it must be strictly or regularly followed and applied evenhandedly to all similar claims."  Hickman v. Spears, 160 F.3d 1269, 1271 (10th Cir. 1998).  When a claim has been defaulted in state court on independent and adequate state grounds, the federal habeas court will only consider the claim if petitioner can demonstrate "cause and prejudice or a fundamental miscarriage of justice."  English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998).

The Kansas Supreme Court determined that the argument was not preserved for appeal.  At trial, the basis for counsel's objection was that the evidence was not proper rebuttal.  Thus, a claim by petitioner that the testimony of Huerter and Fernando was inadmissible

as improper character evidence is procedurally defaulted.  The Kansas Supreme Court's ruling that it will not hear arguments not raised in the trial court is long-established and specifically reliant on state law.  See K.S.A. § 60-404 ("A . . . finding shall not be set aside . . . by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."); State v. Cooper, 252 Kan. 340, 349, 845 P.2d 631, 638 (1993) (refusing to consider an objection to evidence based on prejudice when the objection at trial was based on relevance).

Therefore, petitioner's claim is procedurally defaulted, and may only be considered by this court upon a showing of cause for the default and resulting prejudice, or in order to prevent a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.  Cause for default must be some objective factor, external to petitioner and his counsel, "something that cannot fairly be attributed to [them]."  Id. at 753.  "Examples of such objective factors include a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable."  Klein v. Neal, 45 F.3d 1395, 1400 (10th Cir. 1995)(internal quotations and citations omitted).  Petitioner has made no such allegation of cause, and the court cannot find any basis in all of petitioner's briefing to give cause for procedural default.  Ineffective assistance of counsel can be cause for procedural default, Murray v. Carrier, 477 U.S. 478, 488 (1986).  However, the exhaustion doctrine requires "that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a

-23-

procedural default." Id. at 489. Petitioner has not raised an ineffective assistance of counsel claim with regard to his counsel's performance on admissibility of Huerter and Fernando's testimony. Moreover, petitioner has not shown prejudice.

Finally, a fundamental miscarriage of justice in this context means that the petitioner is probably innocent of the crime. Phillips v. Ferguson, 182 F.3d 769, 774 (10th Cir. 1999). The only issue in the underlying trial was whether petitioner committed premeditated murder. Petitioner testified that he did not remember anything that had happened because he had blacked out. However, petitioner concedes that he was the one who shot Thomas, his grandmother. Hence, the court finds no fundamental miscarriage of justice.

### F.  Failure to Instruct

Petitioner asserts that the trial court erred in failing to give an instruction on his theory of defense, i.e. that he was suffering a blackout during the crime. Petitioner failed to request a jury instruction based on his alleged blackout. The Kansas Supreme Court held that the failure to give the instruction was not erroneous since the district court instructed the jury on diminished capacity.

In a habeas proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden. Lujan v. Tansy, 2 F.3d 1031, 1035 (10th Cir.1993), *cert. denied*, 510 U.S. 1120, 114 S. Ct. 1074, 127 L. Ed.2d 392 (1994). A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial. Shafer v. Stratton, 906 F.2d 506, 508 (10th Cir.), *cert. denied*, 498

U.S. 961, 111 S. Ct. 393, 112 L. Ed.2d 402 (1990). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737, 52 L. Ed.2d 203 (1977).

Having reviewed the record, the court finds that petitioner has not shown that the failure of the trial court to specifically instruct on petitioner's theory of blackouts constituted a violation of due process. The trial court instructed the jury on diminished capacity.[5] The diminished capacity instruction did not preclude petitioner from arguing his theory of defense. Given the context of the case, petitioner had every opportunity to argue his theory, and the jury had the opportunity to consider it. The failure to specifically instruct on this theory, in light of the circumstances of this case, does not rise to the level of an error that rendered the trial so fundamentally unfair as to cause a denial of a fair trial.

### G.   Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel in violation of the Sixth Amendment requires petitioner to show that 1) his counsel's performance fell below an objective standard of reasonableness; and 2) but for his counsel's unreasonable errors, there is a reasonable probability that the outcome of the proceeding would have been different. Williams v. Taylor, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); Strickland v. Washington, 466 U.S. 668, 688,

---

[5] The diminished capacity instruction states as follows:
Diminished mental capacity may be considered in determining whether the defendant was capable of forming the necessary intent to kill and pre-meditation.
Flournoy I, 272 Kan. at 807.

694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Petitioner asserts that his trial counsel was ineffective for failure to file a notice of intent of mental defect, failing to produce his Navy medical records to the Larned staff at the initial evaluation and failing to establish that the mitigating circumstances outweighed the aggravating circumstance.  (Doc. 1 at 12h-m).

In evaluating the performance of trial counsel, the Supreme Court provided the following guidance:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, <u>a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy.</u>" See <u>Michel v. Louisiana</u>, <u>supra</u>, 350 U.S., at 101, 76 S. Ct., at 164.
>
> . . .
>
> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

<u>Strickland</u>, 466 U.S. at 689-90, 104 S. Ct. at 2065-66 (emphasis

-26-

added).  Thus, under this standard, counsel's performance is presumed competent, and petitioner bears the burden of rebutting that presumption.

For his first ground, petitioner asserts that his trial counsel was ineffective for failing to file a timely notice of mental defect. Petitioner, however, has failed to establish how he has suffered any prejudice.  Petitioner clearly was able to put on his defense of mental defect.  Petitioner testified about his blackouts and the jury was instructed on diminished mental capacity.  The Kansas Court of Appeals' decision was not an unreasonable application of Strickland.

Second, petitioner asserts that his trial counsel should have made his Navy medical records available to the staff at Larned prior to his first evaluation.  Again, petitioner fails to demonstrate any prejudice.  While the Larned medical staff did not have petitioner's Navy records during the first evaluation, petitioner's trial counsel sought and was granted a second evaluation by Larned so that the medical staff could perform an adequate evaluation with all of petitioner's medical records.  There is no evidence that the results of the evaluation were somehow affected by the late delivery of the medical records.  Moreover, after a review of the hearing transcript, petitioner's counsel informed the court that he had "found out," subsequent to the first medical evaluation, that petitioner had served in the military and suffered blackouts.  (R. Vol. IV at 3). Therefore, counsel was not deficient for failing to supply the Navy medical records prior to the first evaluation.

Finally, petitioner asserts that his counsel was ineffective for failing to fully investigate potential mitigating factors and failing

-27-

to argue petitioner's mental history and mental condition at the time of the crime.[6]   The Kansas Court of Appeals upheld the district court's findings that petitioner's counsel made the pertinent arguments during the sentencing hearing.   Flournoy III, 144 P.3d at 81.   First, petitioner does not identify what, if any, additional mitigating factors existed.   Second, no evidence existed, besides petitioner's testimony, that petitioner suffered from any mental condition.   According to petitioner, he only suffered from blackouts. The jury did not believe that he suffered a blackout and the court finds it incredulous that the court would have considered and accepted petitioner's "blackouts" to be a mitigating factor. See Turrentine v. Mullin, 390 F.3d 1181, 1202 (10th Cir. 2004)(counsel's failure to introduce evidence of the petitioner's failure to formulate intent in the sentencing phase would not have had an impact on the sentence since the jury's guilty verdict clearly rejected petitioner's defense).   Accordingly, petitioner can show no prejudice as to this claim.

Petitioner has failed to show that his counsel was ineffective pursuant to the standard in Strickland.

**H.   Hard 40 Sentence**

Finally, petitioner contends that the court erred in weighing the sole aggravating factor against the sole mitigating factor and that the court erred in declining to consider cooperation with the police as a mitigating factor.   It is clear petitioner is challenging his

---

[6] After the Kansas Supreme Court's decision to remand the case for re-sentencing, the district court reweighed the factors based on the prior evidence submitted in the sentencing hearing.   The court did not hold a new sentencing hearing.

sentence based on application of state law.  Petitioner fails to allege any constitutional violation.  Errors of state law are not grounds for federal habeas relief.  <u>Woodberry v. Bruce</u>, 2001 WL 681667 *1 (10th Cir. June 18, 2001)(claimed sentencing error is based on application of state law)(citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991)).

**III.  CONCLUSION**

For the foregoing reasons, petitioner's application for a writ of habeas corpus is DENIED.

Two things should be obvious even to a casual reader of this Memorandum and Order.  First, petitioner raises all but one of the claims ruled upon by the state courts.  Second, the court spent considerable time reviewing the entire record and combing through petitioner's filings.  Nevertheless, the court believes that the judicial resources spent were largely unwarranted because petitioner's claims do not begin to meet the requirements for AEDPA review (pp. 5-7, <u>supra</u>).  Indeed, the requirements are not even mentioned in the petition.  Only passing reference is made in the traverse, but no effort is made at analysis.  The court examined all of petitioner's claims out of an abundance of caution, since the Tenth Circuit requires the court to construe a <u>pro se</u> petitioner's application liberally and because it would be an even greater waste of resources to deal with this case in the event of a reversal.[7]

---

[7] While the court readily understands the purpose behind the liberal construction rule, the court has doubts that petitioner is proceeding without assistance.  Petitioner's application and traverse are well-written and exhibit a knowledge that is unlike typical <u>pro se</u> filings.

It would be helpful for the Court of Appeals to explain the extent, if any, a district court is required under these circumstances to review a state prisoner's application for habeas relief.

A motion for reconsideration is neither invited nor encouraged. Any such motion shall not exceed three double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (D. Kan. 1992).  The response to any motion for reconsideration shall not exceed three double-spaced pages. No reply shall be filed.  Identical requirements and restrictions shall apply to any application for certificate of appealability or any other submission, however styled, directed to this Memorandum and Order.

IT IS SO ORDERED.

Dated this __7th__ day of August 2007, at Wichita, Kansas.

<u>s/ Monti Belot</u>

Monti L. Belot

UNITED STATES DISTRICT JUDGE

-30-